UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 06-61690-CIV-COHN/SNOW

JOHNNY JOHNSON,

        Plaintiff,

v.

UNITED STATES OF AMERICA,

        Defendant.
_____/

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

THIS CAUSE is before the Court upon the bench trial held on September 10 and 12, 2007. The Court has carefully considered the credibility of the witnesses presented and the evidence admitted during the trial. The Court has also considered Plaintiff's Proposed Findings of Fact and Conclusions of Law [DE 27], Defendant's Proposed Findings of Fact and Conclusions of Law [DE 25], Defendant's Motion to Strike Addendum Clause or to Cap Damage Recovery [DE 24], and the prior briefs regarding summary judgment.

### I. BACKGROUND

Plaintiff Johnny Johnson ("Plaintiff") filed this action against the United States Postal Service for negligence pursuant to the Federal Tort Claims Act. Plaintiff was delivering pallets and cardboard boxes to the United States Post Office in Plantation, Florida, for use in a charity food drive. Plaintiff fell when the hinged plate of the post office loading dock collapsed. Plaintiff alleges that his injuries were caused by the post office's failure to warn of the dangerous condition of the loading dock.

Accordingly, pursuant to the requirements of Rule 52 of the Federal Rules of Civil Procedure, the Court issues the following Findings of Fact and Conclusions of Law.

## II.  FINDINGS OF FACT[1]

1. The Plaintiff, Johnny Johnson, was 25 years old at the time of the May 13, 2005 incident which gave rise to this lawsuit.

2. Plaintiff has a life expectancy of 52 more years.  Plaintiff's Exhibit 7.

3. In May 2005, Johnson was employed as a truck driver by Mardi Construction Company (Mardi) in Fort Lauderdale, Florida.

4. Each year, the United States Postal Service ("USPS") Letter Carriers hosts a food drive for the Fort Lauderdale Food Bank and Feed the Homeless Program.

5. Mardi participates in the food drive by donating the pallets and cardboard boxes in which the food items are packaged and distributed.

6. As part of the food drive, on May 13, 2005, Mardi dispatched two of its employees, Johnson and his co-worker, Thadius Irvin, to the Plantation Post Office to deliver pallets and empty boxes for the food drive.

7. Plaintiff and Irvin are first cousins.  Irvin had worked at Mardi for a longer period of time.

8. On the day of the incident, Plaintiff was the driver of the truck.  Mr. Irvin exited the truck and directed the Plaintiff in backing the truck up to the loading dock.

---

[1] Any of the foregoing factual findings that may represent conclusions of law are adopted as conclusions of law.

9. Plaintiff had never made a delivery to this Post Office and was unfamiliar with its loading dock. In fact, he had not made a delivery to any dock area prior to this delivery.

10. Plaintiff backed the truck up with enough space for the truck's lift gate to be extended down underneath the hinged plate of the Post Office's loading dock.

11. USPS employee Carol Wellborn, responsible for the dock that day, testified that she saw from inside the building that the truck was backed up "caddy-corner" to the dock. She stated that this was incorrect, although sometimes trucks did this if they were just placing things on the dock.

12. Irvin testified that the hinged plate of the Post Office's loading dock was in the down position (extended parallel to the ground) and that the truck's gate was down before Plaintiff finished backing the truck up. Plaintiff's Exhibit 1, 3, and 4.

13. There was a gap between the hinged plate and the truck's gate, so the hinged plate did not rest on the truck's bed or gate.

14. Other than noticing a gap between truck bed and the hinged plate, Plaintiff testified that he did not look at the dock in relation to the height of the truck.

15. The loading dock also had a scissors lift device that could be raised and lowered but neither Plaintiff, Irvin, or any USPS employee testified that it was used that day, or that Plaintiff or Irvin had ever used such a device.

16. Irvin walked up the stairs to ring the bell labeled "Please Ring Bell for Service," while Plaintiff exited the truck, walked up the stairs to the loading dock, and entered the truck to begin unloading.

17. Wellborn answered the bell but did not know where Plaintiff and Irvin were to place the boxes, so she went back in to check with her superiors where to put the boxes.

18. Wellborn testified that when she first came out to answer the bell, she was curious as to why the truck was there, but did not say anything to Plaintiff or Irvin about the angle of the backed-up truck or the use of the hinged plate of the loading dock.

19. Because "it took a while for her to come back," Irvin and Plaintiff began unloading the boxes.

20. After at least one trip carrying boxes across the hinged plate and onto the loading dock, Wellborn returned to tell them where to leave the boxes.

21. Wellborn testified that she was only gone for one minute or so, as she happened to quickly see an employee inside the building who knew where the boxes for the food drive were to be placed.

22. At the moment Wellborn returned outside, Plaintiff stepped onto the hinged plate of the Post Office dock while carrying a load of 20-25 flattened boxes, causing the hook and chain holding up the hinged plate to snap, sending Plaintiff down to the ground.

23. Wellborn testified that when she came back out to tell Johnson and Irvin to put the boxes in a trailer, Johnson stepped onto the plate and it collapsed, stating "It happened so quickly."

24. She assumed Johnson dropped the plate because he was going to back up the

truck further, not step directly onto it carrying boxes.

25. Wellborn testified contrary to Irvin that the hinged plate was in its proper upright position (i.e. not extended out) when Plaintiff first backed in.

26. She also stated that proper USPS procedure was to have the hinged plate left either all the way up, or all the way down, flush against the dock, and not be left extended because of the danger of injury if someone stepped on it.

27. Wellborn had worked three years at that branch, with two years experience as an expediter for that loading dock.

28. Both she and her supervisor, Anthony Catania, testified that the hinged plate was only to be used as a bridge while resting on the back of a truck, and not to support a person without forming a supported bridge. Defendant's Exhibits 1-1, 1-2 and 1-3.

29. Catania further testified that it was the responsibility of USPS personnel to monitor who uses the dock and to assist them to do so correctly.

30. USPS drivers must regularly back up their postal trucks to a narrow range of distance from the edge of the dock to use the hinged plate, often at a viewing distance of 40 feet from the cab of the truck to the dock. They rely on their experience in doing so.

31. Wellborn testified that she had never seen the hinged plate left horizontal to the ground as the drivers routinely properly perform their duty of raising the platform when they are done with loading/unloading.

32. As a result of his fall, Plaintiff suffered a spine injury.

33. Dr. Gary Gieseke, a neuro-surgeon, testified that Plaintiff suffered a herniated disc at the L5/S1 location. Plaintiff's Exhibit 8.

34. Plaintiff received care under Florida's Workers' Compensation Law as his injuries occurred while working for Mardi Construction. Fla. Stat. § 440.01 et seq.

35. Plaintiff received benefits of $11,664 in medical care and $16,540 in lost wages, which represents two-thirds of his actual lost wages. Plaintiff's Exhibit 6.

36. Dr. Gieseke concluded as a result of an MRI of Plaintiff's spine taken on June 1, 2006, that Plaintiff should have a micro laser disectomy procedure to fix a progressive herniation in the L5/S1 area. Plaintiff's Exhibit 8.

37. Dr. Gieseke testified that such surgery would cost $50,000 if done in a hospital, though he conceded it could be done in an outpatient facility.

38. He testified that Plaintiff cannot do any lifting with his back in his current condition, and even with using his legs to lift, he should not lift more than 30lbs intermittently.

39. Plaintiff was involved in a car accident on February 14, 2000, after which he does not recall experiencing pain.

40. Dr. Zeide, Defendant's expert, testified that Plaintiff's current condition was not caused by this fall, but rather from normal genetic aging or the prior accident.

41. Dr. Zeide testified that the MRI in evidence showed loss of water at L5/S1, indicating an injury which occurred several years prior to the June 1, 2006 MRI.

42. Dr. Zeide also referenced a previous electromyograph (EMG) performed on

Plaintiff which showed problems at the L4 area of the spine.

43. The MRI in evidence did not show disc herniation of the L4 area.

44. Dr. Gieseke testified that if the disc herniation occurred in 2000, the MRI would show calcification in the area, which it does not.

45. Dr. Zeide testified that no surgery is needed, but that if the procedure was needed, it would cost $12,000 in an outpatient facility based upon a figure of 200% of the Medicare reimbursement rate.

46. Dr. Zeide recommended conservative treatment, which could consist of physical therapy two to three times per week at a cost of $65 per visit, and the prescription pain medication Naprosyn at $4 per month or the over-the-counter pain reliever Aleve available at $8 per month.

47. The Court finds that Dr. Giesecke's testimony and the MRI in evidence show that more likely than not Plaintiff is going to require surgery in the near future, in addition to conservative treatment for one year.

48. A reasonable amount for the surgery is $31,000, which is derived from the average of the two experts' opinions.

### III.  CONCLUSIONS OF LAW

Under the Federal Tort Claims Act, this Court must look to Florida law for the underlying law of negligence.  To state a claim for negligence under Florida law, a plaintiff must allege a duty of care owed by the defendant to the plaintiff, breach of that duty of care, causation and resulting damages.   Mosby v. Harrell, 909 So.2d 323, 327

(Fla. Dist. Ct. App. 2005).

### A. Duty

Plaintiff was a business invitee as he was delivering supplies for the benefit of the Postal Service's charity event. Plaintiff was invited onto the property to deliver supplies to the loading dock. His presence there, even if he began unloading without waiting for assistance, remained that of a business invitee. Whether he unreasonably began using the loading dock to unload without waiting for assistance is an issue related to comparative negligence and breach of the duty of care.

Once considered a business invitee, then Defendant would have a duty to warn of any concealed dangers. Crawford v. Miller, 542 So.2d 1050, 1051 (Fla. Dist. Ct. App. 1989) ("The duty of the landowner to a business invitee is to maintain the premises in a reasonably safe condition and to warn the invitee of latent perils which are known or should be known to the owner but which are not known to the invitee or which, by the exercise of due care could not be known to him." (internal citations omitted)). Under the invitee standard described above, Defendant argues that the loading dock contained no concealed dangers, and that Plaintiff should have realized that the extended hinged plate had to be supported by his truck bed and not just the chain. Defendant contends that the dangers of a loading dock, with its drop off from the dock to the ground below, are open and obvious, and therefore Defendant did not breach its duty of care.

The various Florida cases relied upon by Defendant for the open and obvious doctrine do not involve a loading dock, or something not encountered in everyday life.

See e.g. Circle K Convenience Stores, Inc. v. Ferguson, 556 So.2d 1207 (Fla. Dist. Ct. App. 1990) (ridge between concrete and asphalt at gas station open and obvious); Gorin v. City of St. Augustine, 595 So.2d 1062, 1063 (Fla. Dist. Ct. App. 1992) (en banc) (drop off from curb to street open and obvious); City of Melbourne v. Dunn, 841 So.2d 504, 505 (Fla. Dist. Ct. App. 2003) (danger of walking on planter rather than around it was open and obvious).

Defendant does put forth an unpublished Michigan state court decision involving a loading dock hinge plate. The court in that case, Cross-Douglas v. Ford Motor Co., 2001 WL 691226 (Mich. App.), concluded that the loading dock dangers were open and obvious. Though the facts are mostly similar to the case at bar, in that the plaintiff in Cross-Douglas also used a truck that was lower than the dock, resulting in the platform hinged plate not being supported by the bed of the truck, the key distinguishing fact is the existence of the chain supporting the hinged platform in this case, and the opportunity for USPS employees to specifically warn Plaintiff of the dangers of using the hinged plate before unloading began. Therefore, the conditions at this Post Officer were not open and obvious, and Defendant had a duty to warn Plaintiff about the dangers of the loading dock.

## B. Breach and Comparative Negligence

Defendant failed to warn Plaintiff about the dangers of using the unsupported hinged plate of the loading dock. It was not completely reasonable to assume that the loading dock could be supported by the chain during operation without resting upon the bed of a truck. The one sign asking persons to ring the bell for assistance was an

9

insufficient warning of the danger, particularly in this case when USPS employee Wellborn had at least one, if not two opportunities to say something about the use of the loading dock.  First, she observed the truck backing in from inside the building. She thought it was backing in incorrectly.  Second, Wellborn should have warned them when she answered the bell that the hinged plate of the loading dock could not support the weight of unloading the boxes.  Even accepting her testimony that Plaintiff or Irvin lowered the hinged plate themselves, and that she did not have a chance to warn the second time she came back, she also testified that she assumed Johnson dropped the hinged plate because he was going to back the truck up further, not step out onto it.

This failure to warn Plaintiff or Irvin of the danger of the particular kind of hinged plate loading dock at this facility was the principal cause of this accident.  Plaintiff's failure to inspect the hinged plate and failure to wait for instructions was a secondary cause of the accident.  USPS employees, particularly Carol Wellborn, had superior knowledge of the loading dock in question, locating at their business establishment, and therefore had a duty to provide a warning regarding usage of the loading dock. Such warning, if not made obvious by a sign, should have been given at the first moment Wellborn learned that Plaintiff and Irvin were there to make a delivery, given that she already knew they had parked "caddy-corner."

As noted, however, Plaintiff's negligence also contributed to causation of this accident.  Under the comparative fault doctrine in Florida law, the finder of fact must apportion the fault of the parties.  Hoffman v. Jones, 280 So.2d 431, 438 (Fla. 1973). The Court concludes that Plaintiff is 30% at fault, while Defendant is 70% at fault.   The

Court will therefore award 70% of the total damages described below.

### C. Causation of Injury and Damages

The Court concludes that Plaintiff has shown by a preponderance of the evidence that his lumbar spinal injury was caused by the fall to the ground as a result of the negligence of the USPS. Dr. Giesecke's testimony regarding causation of the disk herniation at L5/S1 is more credible than the causation analysis of Dr. Zeide. Plaintiff has a progressive disk hernation that will more likely than not require surgery to return him to his state of health prior to this incident. The past and future medical damages shall not be reduced because of any prior injury since the injury sustained as a result of this fall and USPS's negligence contributed substantially to producing this injury.

The future medical damages therefore must conclude an amount for the micro laser disectomy described by both experts.[2] Plaintiff has shown by a preponderance of the evidence that he is likely to need this surgery in the future as a result of this accident. As found above, a reasonable amount of damages for this surgery is $31,000, which includes all costs for doctors, facility, assistant, as also discussed in the testimony. In addition to the cost of the surgery, Plaintiff should also receive the cost of one year of physical therapy and medication. Using Dr. Zeide's description of $65 cost per visit at two to three times per week produces a total of 130 visits at a cost of $8,450, plus $96 for over-the-counter pain medication.[3]

---

[2] The past medical damages are the Workers' Compensation payment of $11,664.

[3] Though Dr. Zeide testified that the prescription medication cost less, a doctor's visit or multiple visits would be required to obtain a prescription. Therefore, the over-

Turning next to lost wages, the Workers' Compensation amount of $16,540 in lost wages, which represents two-thirds of his actual lost wages, leads to a total recoverable amount of $24,810 (divide $16,540 in half and then add that amount). As to future lost wages, however, Plaintiff has not shown by a preponderance of the evidence that he sustained a permanent impairment. Dr. Giesecke did not testify that Plaintiff was permanently impaired, while Dr. Zeide testified that Plaintiff was not impaired.[4] Therefore, there is no long term reduction in Plaintiff's potential future wages. In fact, with the surgery, Plaintiff is likely to return to his pre-accident abilities.

The final category of damages is pain and suffering damages. Plaintiff argued that he should recover three times his pecuniary damages for past pain and suffering ($11,664 plus $24,810), which would yield a total of $109,422. As to future pain and suffering, Plaintiff argues that because his life expectancy is 52 more years, a substantial sum should be awarded. The Court concludes that a pain and suffering total award of $50,000 is reasonable, for both past and future pain and suffering. This amount is approximately two-thirds of the total compensatory damages.

Therefore, the total damage award is $88,214, consisting of $11,664 past medical, $39,546 future medical, $24,810 past wages, zero for future wages, plus $50,000 for past and future pain and suffering, all reduced to 70% of this amount for

---

the-counter cost is the less expensive alternative.

[4] Only under cross-examination did Dr. Zeide agree that one possible interpretation of American Medical Association guidelines and tables regarding Plaintiff's injury could yield a conclusion of a 5% impairment -- but that was not Dr. Zeide's opinion

comparative negligence.[5]

As to the total damages award, Defendant filed a motion shortly before trial to cap damages at $100,000 because Plaintiff belatedly amended his initial $100,000 administrative claim and seeks $1 million in his Complaint in this action. As the Court concludes that Plaintiff's total damage award will not be greater than $100,000, the Court denies this motion as moot.

### IV.  CONCLUSION

The Court shall separately enter a final judgment in favor of Plaintiff based upon these findings of fact and conclusions of law.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida this 24th day of September, 2007.

/s/ James I. Cohn
JAMES I. COHN
United States District Judge

cc: Lawrence Bohannon, Esq.

Marilynn Koonce Lindsey, AUSA

---

[5] The Court understands this award is subject to a lien by Workers' Compensation, and nothing in this ruling may be construed to interfere with that lien.